Stopaq Amcorr Inc. Stopaq Amcorr Inc. Mr. Kastanis. Mr. Kastanis, I'm sorry, before you begin, what is the status of the European patent litigation? Has that still stayed? Excuse me for a second, Your Honor. My colleague informs me that he believes that it still stayed. Okay. Again, thank you. Good morning. Chief Judge Rader, and may it please the Court. There are two principled issues in this appeal. One involves the plurality of fractions term in Claim 1 of the patent. The other involves the meaning and application of the term filter. District Court's errors with respect to both claim terms lay principally in its decision, in its short order, to add unwarranted limitations to both terms. Let me start with the plurality of fractions issue. The District Court's order added onto the claims the subjective requirements that a fraction must consist of a, quote, high number of particles and could not be represented by what the Court termed a minor bump on a particle size distribution graph. I want to interrupt you because part of the problem, certainly, I have had in this case, which I think the District Court's opinion communicates, the District Court had as well,  starting with the claim language. So I want to ask you this. How many fractions are here? Well, the answer, Judge Taranto, is it depends. Because what I don't know from what you're holding up in front of me is what the content of... Let's say it's all one material. It's all one material. And there's this from, what is it, two to four micrometers, exactly the same number. Obviously, what I have in mind is you can just draw a line right down the middle of it. And then would you say there's a fraction from two to three and a separate fraction from three to four? Well, I think you could. I think the problem is that you would never, in reality, see a distribution like that. The distribution is usually going to be something that is going to have something like a bell curve, perhaps with shoulders in it. But I'm truly mystified about what this language is supposed to mean. It seems to me you're, I think on page 26 or so of your brief, you say part of a whole. Well, two to three and three to four are parts of the whole. And then, so it seems to me, and in fact, they're not just two fractions here. There's an infinite number of fractions, assuming continuity as opposed to discreteness of this scale. So there are many different fractions. Suppose I did that. And obviously, by definition, each one would have different size particles. What does different size particles mean? That's one question. Second, how does that differ from different size distribution? Let me try to help you because I think actually you're going to the right part of the claim to answer the question that you posed to me about the term fraction, which is in isolation, the term fraction is a very simple word to understand. It's used a handful of times in the patent. It doesn't seem to have a special meaning that's given to it by the claims or by the specification, certainly not in the prosecution history. When you look at the language, it is a plurality of fractions, each comprising different size particles. So each separate fraction, let's say there are two since it has to be a plurality of fractions, each separate fraction has to comprise different size particles, which means they can't all be the same size particle within each fraction. Okay, so it seems to me that that's already something that was the first question I wrote down. Each fraction has to include different size particles. So in a given fraction, the particles themselves within that fraction can't be of uniform size, or do you mean that the size of the particles in fraction number one is different from the size of the particles in fraction number two? I had understood you to say the second thing. I want to make sure that I'm not sure which is the first and which is the second thing. Under your first, there could not be infringement because every particle in this is of the, I'm sorry, forget about that. I think that what you want to hypothesize in the chart that you're throwing up in front of me here It wouldn't be a particle size chart at all. Something where it is at zero going across and then it is a completely straight spike up and down at a particular point and then across. In that case, all of the particles would be exactly the same size within the fraction. And I think, if I understand the claim term correctly, that the plurality of fractions each comprising different size particles wherein said different fractions have different particle size distributions is the second limitation on the term fraction. And what does that mean? It means like within one fraction there's like a bell curve and in another one there's a, I don't know, like a Poisson distribution or what? Well, if you were to take the chart that you used and imagine that it was a bell curve instead, I could not simply say that, oh, well, half of that fraction is one, or half of what that curve is one fraction and half of it is the other. I'm trying to understand why in the world not? Well, because the blame language requires the different fractions to have different particle size distributions. Right, so the left half of the bell curve would be different from the right half of the bell curve. And if that were the case, and if... I mean, by definition it is. Right, absolutely, absolutely. So it's always the case that in any real world example you will have multiple fractions with different sizes and different size distributions? No, I don't think that's the case at all because you could potentially have the exact same size. Let's step back here and understand the point of the filler. The point of the filler is to have some different size chunks, if you will, some larger chunks and smaller chunks that will do a nice job of mixing and helping out with the flow rate of the otherwise fluid polymer. So you've now added these different size chunks which will fill in to each other. The district court did at least use an analogy which is useful here. They use basketballs and baseballs and tennis balls and golf balls and they're different sizes and they fill in together. But if they're all the same size, then there's no point in adding because they won't fill in in the way that this invention presupposes. So you need the distribution and you need the fractions of different sizes. I think that does in some way also raise the issue of whether fractions can be multiple materials or whether it has to be a single material. Let me just try once again. Come back and explain to me what the two different requirements for each fraction mean and how they differ, different size particles and different particle size distribution. So let's imagine one fraction at a time. Fraction one has to have different size particles within it. That's the first limitation. The second limitation is fraction two can't have the same distribution as fraction one. So it really is something like if one of them has a Gaussian distribution of sizes, the other one can't have a Gaussian distribution of sizes. If the Gaussian distribution is exactly overlapping, then that's correct. But then it seems to me, why wouldn't they be able to have the same sizes in the two fractions? Because you said that different sizes is something that applies within each fraction. That's what I understand the claim to be, yes. So you can have two fractions and each of them has the same size particles in them. Fraction one has a range of one to two micrometers and the fraction two has a range of one to two micrometer particles. Two different fractions, same size particles. But if they were distributed a little bit differently, one was Poisson and one was Gaussian, that would satisfy the claim? Yes. That would, especially the last limitation where it says where in said different fractions have different particle size distributions. What does that have to do with any of the graphs that have been held out here as proving infringement, all of which seem to find fractions defined by non-overlapping sizes? Right. The graphs that have been presented show, this is the challenge with understanding these graphs because when you put everything together, it will show what looks like roughly a single bell curve or maybe a series of bell curves. But what the experts in this case said, even AMCOR's experts on the other side, was that you look in one of these curves to the shoulders. You look to something and you can find that, for example, I'm trying to find exactly the citation for you. At A1130, for example, there's an example of a, that's the outside work that was being done at AMCOR's request in order to try to come up with something competitive to STOPAX invention. And what you see there is what scientists there characterized as a trimodal curve, which is to say three fractions. The parties have agreed that this limitation is met if the curve is multimodal. What does that mean? Well, multimodal means that you can, in fact, maybe the best... That's what we're talking about right now. I understand that. So I'm trying to understand the... How does that agreement help us? Well, I think it helps you because if you look for example, if we use 1030 and the graph that is there is an example to help the court. I'm sorry, 1130. I said 1030. I meant 1130. And I'm holding it up for the court here. Yes, I have it. You will see that here there is a shoulder. So it's trimodal. This is trimodal, yes. And so what this really reflects are three different fractions. Is this your product, your client's product or the... The other side's product. This is actually the description of our product being done, being analyzed by our opponents in their pre-production ramp-up. The y-axis, Q3 percentage, do you know what that means? I'm trying to remember exactly what the... Some graphs are about mass frequency, others about volume frequency. And now I'm looking at Q3. My colleague informs me that that's meant to be volume. And I think there also may be some sort of a translation issue with regard to that particular document. But then if you look, for example, at Dr. DeLuca's declaration, you'll see where... And this is the discussion that I was having with Judge Toronto earlier. I'll put my finger on a graph that will help you, I hope, here. As an example, so here's a multimodal curve at A934. And you'll see that there's a peak there at the top. I'm sorry, I'll hold that up just for my opponent. At A934, you'll see that there's a peak at the top and then there's a peak over here to the right. And what Dr. DeLuca does, and you can read the explanation of how he does this, is he deconvolutes that graph to show that there are actually three fractions. What's the vertical axis here since we have at least three different kinds of charts? This is also volume percentage. And so with the deconvolution, you see that there are actually three different fractions, three very distinct fractions here. There's one very small one that's highlighted with the red arrow. There's a large one with the blue arrow and a medium one, shall we say, with the orange arrow labeled numbers. Since I think this is arithmetically obvious, you can get extremely different charts according to whether you use mass or volume or simple number of particles. How do we know which is the right one to use, particularly when the horizontal scale is actually nonlinear? Well, I don't know that the patent tells us exactly which one to use, but I think that it doesn't matter in this case because you get the same result. Well, that's what I'm not sure. It seems to me you include one chart in the section of your brief, 38 to 42 or something, about how there's infringement even under the District Court's claim of construction, the chart that comes from A935. That's a mass chart. And the little bump off to the right is, in fact, involves that of mass. No, that's a volume chart. I'm sorry. That's a volume chart. And the little bump, little peak at I think is 18 micrometers, is a little peak that comes away from a slight trough at about 10 micrometers. It's a very small peak, but because the horizontal scale is what it is and volume is a cube of radius, in fact, a frequency chart would almost certainly have no bump there at all. Well, it would have some bump. No, it wouldn't have any. Well, because if it shows, I don't think that would be the case, Your Honor, because if there is anything at that level, there should be a bump. Now, maybe if you compress the graph so much. No, you're not compressing it. The volume of a 10-micrometer particle is about one-sixth the volume of a 18-micrometer particle. So unless you were, if you were now just doing counts of particles, it would actually still be decreasing because each 18-micrometer particle accounts for six times the amount of volume of the 10. So I'm already into my rebuttal time, and I apologize for that, but I will go on. Let me answer that by saying to you that I think the problem with that is that there is no requirement in these claims for high, low, medium amounts. The point is to have a distribution. The claim language says what the claim language says, and that is that with respect to the fraction requirement, the plurality of fractions requirement, it doesn't say that it has to be a high fraction, it has to be a low fraction, it has to be a medium fraction, nor, quite frankly, does the judge in his summary judgment order give us any guidance as to what high or low is. He has pronounced these bumps to be insufficiently high or insufficiently large in order to count for the purposes of his construction. But the error is in the construction itself. I'm sorry, I've got a quick question there before you go. You'll be back. How would one go about avoiding infringement of this claim? How would one go about creating a single fraction of a filler? How would one go about it? Honestly, I don't know because I'm not a material scientist. One could imagine easily that you could have articles... It's patent law we're talking about, though. I understand. Well, but with regard to how to avoid infringement, I know that was the district court's concern. But it seems to me that there are plenty of ways to avoid infringement, which is that you can... Let's put aside the fluid polymer aspect of it. But with regard to the filler portion of it, you could have one fraction that has exactly the same particle size. You could have two fractions that have exactly the same distributions. Neither of those meet the language of the claim. And whether that's feasible as a material scientist, I can't say. There is some testimony, at least attorney arguments on the record, that that's not very feasible. But even, I think, for example, the Smith-Klein versus Apotex decision from this court, which I think Judge Rader wrote for the court, the district court tried to impose a limitation of commercially significant amounts of PHC hemihydrate in that case. And this court said, no, there's no commercially significant limitation in the claim language. It says, PHC hemihydrate, that's the way we're going to read the claim. That's the same way here. Let me ask a different question. I'm sorry, I'm keeping you. No, please. I'm here to help. If the accused product has a smooth curve, then I guess in your estimation, that's a single fraction. But as soon as there's any deviation in the smoothness of that curve, wiggles, bumps, whatever you want to call them, shoulders, I don't know, then all of a sudden, there's a second fraction present. Is that a fair way to understand your argument? That's not only a fair way to understand my argument, but it's also exactly what their expert, Dr. Reitman, said. But it's entirely premised on the curve having to be perfectly smooth in order to be convinced that there's only a single fraction. Right, and that's the way the claims were written in Dr. Reitman, in A619. The claims don't talk like that, though, right? No, the claims are written very simply. It says fraction. It says fraction with these two further limitations on fraction. But we have to understand fraction to mean smooth curve. Well, I think the evidence in this case, that's what you would understand it to mean, yes. And where's the best evidence in this joint appendix that tells me I need to translate fraction to mean that? Well, again, I was giving you the citation to not only Dr. Reitman of A619, paragraph 20C, where she remarks that the characteristic inflection or change in slope that would identify a multimodal size distribution. That's exactly what we're, and Dr. DeLuca, are relying on. And Dr. DeLuca also, in his declaration in A902, paragraph 14, follows the same approach. If I could just say, since I'm already taking great advantage of the court's patience with me, with regard to the filler limitation, that I haven't spoken of yet, I'll just say that I think our briefs cover that mostly. The district court imposed a from one material limitation onto that claim language. That's not supported by the claim language, by the specification, or by the prosecution history. It's also not supported by claim two for the reasons that we put forth in our brief that has to do with the particular way that these claims were prosecuted, in that the claim that eventually became claim one was previously inspected on claim two. Can I add to that? The district court gave sort of two reasons for disregarding the polypropylene. One is this one material. Put that aside. But the other, not particularly explained, has to do with the fact that here, the fluid polymer is a polybutylene. Right, polybutene or polybutylene. Butene, is it? Butene. Butene, sorry. And he says that when you add the polypropylene to that, it forms a, I think he called it, homogeneous polymer mixture. That seems to be a separate and independent basis for his excluding the polypropylene. What exactly does that mean? And is there some fluid polymer that when you add polypropylene to, they would not form a homogeneous polymer mixture? Well, let's make clear that we understand the difference between what the district court called a homogeneous mixture and a copolymer or a reaction product. There's no evidence in this record that there's a reaction that's taking place. All that's being said is that when you mix these two polymers together, you get something that is very difficult to differentiate. It's still the same two things in there. And of course, our position, and I think we set forth this forth in our brief, is that that was erroneous as a matter of summary judgment as well as a matter of understanding the claims because the addition of polypropylene to polybutene or polybutylene is exactly the point of the invention. And in fact, the specification of the patent itself specifically describes polypropylene as a filler. And the purpose of a filler is to control the flow of the fluid polymer. In other words, the fluid polymer would just spill all over. It wouldn't be easy to apply. But once you mix in the fillers, and polypropylene can be one of those, and it says exactly that at the bottom of paragraph three, then you control the flow. And that's, of course, what they're doing here. Now, they say that's not a filler. They call it, I think, a tachifier or something like that. But I don't think their label is what should control here. The simple fact is that that is a filler. It's a filler exactly under the district court's construction. And once it's mixed in with the polybutene, then it becomes the harder, easier to spread mixture that can be applied to manhole covers or taped around a metal pipe. So again, thank you for your patience with me. If you give me a rebuttal time, I'll be happy to return. But thank you for your extra time. Thank you, Mr. Castanhas. We'll restore your rebuttal time. And we need to have 25 minutes for Mr. Kevil. And if you need to use that time, it's yours. Thank you, Chief Judge Rader. I think there are a number of issues raised by Noren's appeal by the things they've said in argument today and in argument on summary judgment. But I think you've focused on really the two main points. One is, how do you define a fraction? And two is, is polypropylene a filler in this? Do we have a claim construction from the district court which is clear enough to allow us to properly review this decision? Yes, we do. The district court, what Mr. Castanhas has made a mistake in is saying that there are only two limits to fraction. There are three things in fraction. There's a fraction, a plurality of fractions. You must have that. And then you must have each fraction having different particle sizes from each other fraction. And I can address that point as well. And then said different fractions have to have different distributions. The court defined fraction to be having a distinct particle size range. And that's the correct definition of fraction. Most of what Mr. Castanhas has talked about. I'm sorry, I don't know what those words mean. Having a fraction is, can you finish the sentence please? A fraction is a unique distribution of particle sizes. Does that mean non-overlapping? Non-overlapping. No one fraction can overlap with another fraction in terms of the particle sizes contained in each respective fraction. That is correct, but that is the second limitation, which is each having different particle sizes. So I have fraction one may have from 5 to 10 microns. And fraction two, that has different particle sizes. That's a range of particle sizes. Fraction two then must have something else, say 100 to 200 microns. And that's what the patent teaches. It talks about mixing different fractions. So the discussion we talked about before, where if fraction one, I think it was your example, Judge Serrano, if fraction one had, say, a range of 5 to 10, and then you get another range that has 5 to 10, Mr. Castanhas said, well, that would meet two fractions. But it wouldn't because you have one fraction with a range of 5 to 10. That's different from what the invention talked about. And that takes out that second limitation. What's your best evidence for us understanding that that's the right conception of different sized particles? Two things. You can sort of understand what both of you are saying in terms of that particular claim frame. Let me point to two things. One is the specification says you have to have a mix. That's the point of the invention. I think they say it in their brief. What Mr. Noren came up with was mixing coarse and fine. And so if you're mixing a range of 1 to 5 with another range of 1 to 5, you're right where you started. You don't have two fractions. So I think the specification teaches that's not the correct construction. The other thing is if you look at the prosecution history, putting aside the differentiation argument, the examiner cited three references. One had one polymer and one fraction. And there was a Nakano reference that had one polymer and two fillers. I should have said filler. The Nakano reference had one polymer and two different fillers. And in the Nakano reference, it specifically provides a range for one of the fillers. It says wherein the filler is in 1 to 100 microns. So when the patent office said claim 58, application claim 58 would be allowable if rewritten, he couldn't have been thinking, the patent office couldn't have been thinking that, well, in that range in Nakano of 1 to 100, you could subdivide that over and over or you could just put in the same range. Otherwise, there was nothing allowable subject matter. And that had to be how they understood it, Noren did, when they acquiesced in that rejection, putting aside the strange way they rewrote the claim. But they acquiesced in the rejection and then put in the plurality of fractions, each having different size particles, each having different distributions. Where does the district court, and I'm looking at all three pages of its order, tell us what a fraction is? Or a filler, for that matter. On the second page, under single material multiple fractions, in the third paragraph, the district court says, the filler must include multiple fractions, each with a distinct particle size distribution. For the filler limitation to be meaningful, each fraction must have both a discrete range of particle sizes as well as a high number of particles in that range. I think that's where the district court put in its definition. So you're hinging your understanding on the word discrete, right? Yes. Okay. And what does high number mean? See, high number, I disagree that that's part of the district court's claim construction. Where the district court struggled to try and put its hands around their argument. Their argument for infringement was any change in slope, no matter how minor, created a different fraction. On any of three different kinds of graphs. Correct. And the district court said, I understand what a fraction would be, and in addressing your argument against non-infringement, I'm saying that no reasonable juror could have found these minor bumps or these slight changes are enough. It has to be a high number. I don't think that's his construction. I think that's his response to their position opposing non-infringement. So in this case, I could say in some hypothetical future case, you might have to define what high is. But in this case, the curves that they rely on, curves that you were talking about, where there's an outlier at 60, if you look at the underlying data for those curves. Right. Actually, I wanted to ask you about that. I want to put completely aside those graphs. Okay. What is your response to the A935 graph, which is the one that they reproduce in the section of their brief that says, even under the district court's construction, there's infringement? If I'm remembering right, your response, I don't think you addressed that graph. You addressed some of the other ones where the underlying data essentially indicate that those are, those pieces of the graph are unsupported by the underlying data. Right. But focus just on the A935 one now. So the A935 is- I'm not sure you addressed that in your red brief. This is DeLuca's deconvolution, right, after the fact. So this does not take into account, this addresses, it doesn't take into account agglomeration. Moreover, you are absolutely right on the frequency percentage. At the high particle diameters, there is zero frequency of particles that size. The problem with DeLuca's graph that you look at here, I think the district court understood, is he's showing at 17.8 what he calls a peak. And that's based on his deconvolution of the curve. I mean, maybe you can tell me, does A935 correspond to something on A934 or something else? Yes. I think that's DeLuca's work from A9C. A935, that's not an actual deconvolution, is it? That looks more like, I guess, a theoretical combination. Right. A934 is the deconvolution. Right. That's why I'm asking only about A935, which does have, and it's a volume chart, as I indicated, I mean, I think that the actual number frequency version of this would not have a second bump because of the cubing of diameter. That's absolutely correct. But tell me about what's wrong with this chart, which is the one that they hold out in pages 38 to 40-something of their brief as establishing infringement, even under the district court's claim construction, because I don't remember seeing a response in your red brief to this chart. The response, and I'd have to go back to see if it is in the red brief, but the response is exactly what you're saying. You can't have a curve that you say any change in the curve makes a new distribution. If there is one particle that shows up at a very minor percent of the mass frequency. That's a different point. We're not talking about whether any slope change. Let's suppose that there was some notion, whether well-defined or not, of multimodal, meaning at least two peaks. Why does this not have two peaks? That's fair. I understand your question. Let me address it this way. On multimodal, Chief Judge Rader, you said that there's an agreement that multimodal shows different fractions. There isn't an agreement on that. What there is an agreement is, if you have different fractions, it will show up as multimodal. So if I had 5 to 10 and 100 to 200, it will show up on a distribution curve if I put them together as multimodal. But the converse is not always true. The fraction that DeLuca was working with, that is in here, is a range. Remember that in the patent it talks about you can have a fraction in the 0.1 to 1500 micron range. That would be one fraction. So it's not internally within there. If you find differences in the distribution, then now all of a sudden you have separate fractions. So what this curve is showing you is you have a fraction of a certain size. Remember that on the undisputed facts of this case, Amcor went out and purchased a single material made to be a single size distribution, single fraction. So whatever the range in that is, if you go out and you say, I want to have a 3.4 micron median size, this is going to get milled and sieved, and there's going to be some range in that. And that's consistent with the patent. It's consistent with everything we've seen. But the fraction here is not the change in slope. The fraction is the range in particle sizes. Now that range in particle size is probably much smaller than 20 because of the reasons you're talking about. Let me try it a different way. Are you basically saying, even if theoretically your client went to the filler store and got a whole bunch out of the 2 micron bucket and a whole bunch more out of the 18 micron bucket and then threw them all together and then you ended up having this graph, you wouldn't have two fractions. You'd have only a single fraction because the two alleged fractions end up overlapping somewhere around 10 microns. Is that a way to understand this? And so therefore, because they overlap, because they're not distinct modes, as you were saying before, therefore it can only be a single fraction. Let me start by saying that's not the fact in this case. I would very much change the circumstances of this case if there was any dispute that we went out and said, let's pick one size and another size and mix them together. It's undisputed from Amcor that that didn't happen. It's undisputed the manufacturers each put in declarations saying, we don't mix any different sizes to get what we provided. So that hypothetical to address it, I would think as you spread, if you picked I want 3 micron particles and 5 micron particles, you're very certainly to have overlap. I think your example was broader. It might have been 3 micron particles and 18 micron particles, and I don't know if there's overlap. In the hypothetical, at some range of closeness, you get overlap and you don't have two fractions. But if you have very clear distinction between 3 and 18 and they're very finely milled and sieved, then I think you would not have overlap and you might have two fractions. But that's not what happened in this case, to be clear. So what kinds of graphs should convince us that there's multiple fractions? When there's a gap along the x-axis where there's absolutely zero particles along a certain part of the x-axis range in the middle between two distributions, is that? That is a way that if you mix multiple fractions and then ran a distribution curve on an x-axis, you would see that. Like 1 to 10, one curve, and then 100 to 200, another curve further on down the x-axis. You might have something like that. Is that the only way to know that you have multiple fractions? I think you know you have multiple fractions by what you mix together. If you start with something that's singular and you say, I want a medium particle size of this and I'm not mixing anything, I think you've taken out having two fractions. But this is not a method claim, right? This is a composition claim. Correct. It's whatever is in the mix at the end, whatever is reflected in that final product, right? I think you have to start in having a plurality of fractions, and if fractions have a discrete range, inherently you have to start with two different things. If you start with the same thing, you can't end up with different fractions. The problem is basically what I tried to illustrate in this. As long as they're not all the same size, you always have a discrete range. And so your one micrometer to 1,500 micrometers, infinite number of fractions within that. One to two, two to three, that's an infinite number, but at least 1,500. So I guess I'm not understanding how you are identifying how somebody tells whether there is one or 1,500 or 1,000 fractions in this mix of material whose smallest size is one and whose largest size is 1,500. How do you tell whether there are lots of fractions or just one fraction? Because that's one fraction what you start with. If you can in hindsight, it's one fraction what you start with. Whether it's one to 10 or one to 1,500, it's still one fraction. The patent teaches you that. It puts a very broad range on one fraction. No matter how many peaks and troughs there are in any distribution within that one to 1,500? Yes, that's your starting fraction. So you have to have something different to have a plurality of fractions. And at the same time, part of that one whole fraction, there could be nothing. Say between 200 and 500 microns, there could be no particles. But because the fraction was chosen to be 0.1 microns to 1,500 microns, that would still be a single fraction. Even though what we'd be looking at is two separate curves in that fraction. I think your hypothetical would require some action taken to screen out the middle. You have to remember what we're dealing with is particle sizes. But that really does get to Judge Chen's point that this is not a patent whose scope depends on the process of arriving at the result. It only depends on the result. So it doesn't matter whether when you started, you said, I'm going to deem one to 1,500 a single package. And I use the word package to avoid whatever this term fraction means. It depends what's in the package, whether there's more than one fraction. And it doesn't matter whether somebody different with exactly the same package ended up with it by starting with two bags and mixing them together. The question is, what's in the result? So I guess I'm not understanding how you've offered a definition of how you tell whether there's one or two or a thousand fractions. I think having a discrete range is what the claim first requires and then having different particle sizes. I think to your point, I understand what you're saying that it's not a method. But when the claim calls for a plurality and you set a range, and if you say my range is one to a thousand, and due to some error in manufacturing, there's a gap in there, you've still set your range. And to have a plurality, you must have some other range. Because let me try and address it this way. I understand where you're struggling to come backwards and say, where do the fractions end? In reality, that's what the district court was trying to understand as well. Because under the position that Noren's taken, even today, Judge Chen, you said the only way would be to have a smooth curve. The position Noren took below and took again on appeal is that any change in slope represents a different fraction. But the way I see the district court resolving that is to say, well, I'm going to disregard minor or high or require high numbers. Isn't that incredibly factual as a determination to be made on summary judgment? No, because if you look at the data... Well, when we have this definitional problem here, and you resolve the definitional problem with a subjective factual determination, how do we get around the fact that this is summary judgment? Because the undisputed evidence of what was actually in the accused products, not talking hypothetically if you had some instance where there was a large range in the mix, but what was actually in the products was tested. And the undisputed evidence that's in there shows where Noren is pointing to minor bumps. What Judge Hughes down below said, these are not enough. There is 0% mass at that range. And it is below the margin of error for the test. So no reasonable juror could say, yes, there's a slight... Except that we don't know that for the A935. For the A935, we know that the product started with a certain particles, and there were no particles in that range. So how he got the outlier that shows that... Is there a set of data in this appendix that is the data underlying the A935 graph? You did this with a couple of other graphs, a couple of mass charts. This is a volume one. I'm trying to see whether Dr. DeLuca... So A935 is the calcium carbonate. And the calcium carbonate data from the supplier is at A669. 669? And so what you see when you look at 669 is that in the higher range where DeLuca shows this shoulder at 20 or so, if you look at the chart just to run on 669, which shows cumulative mass 500%, you're now over 100% when you get to where DeLuca is showing the shoulder. We have the whole mass. And if you look at the mass frequency percent there, it's zero. So to answer your point in this, Chief Judge Rader, in this specific circumstance, no reasonable juror could have said, well, that's a separate fraction when the underlying data says there is zero mass frequency percent at that point. Here's the way I'm seeing this, though. Norrin is saying any variation on a curve shows multiple fractions. You're saying any variation shows a single fraction. And essentially they're saying, Norrin's telling me under their position, everyone infringes. Under your position, no one infringes. There's got to be some way to reconcile this, which the district courts claim construction does not help me do and certainly involves some kind of subjective fact-finding. Help me out with that. I understand. I think the difference, Chief Judge Rader, is I'm not saying under my construction no one infringes. If you have two discrete ranges, if you have 1 to 100 and 1,000 to 2,000, and they're put together, the curve should look something like the McDonald's arches with a big gap in between them. And the curve isn't the thing that you look to to say I have two fractions. The fact that you had a range of 1 to 100 and you had a range of 1,000 to 2,000 is what tells you you have multiple fractions. And you would not have, or I can see your question, do you say that there will be multiple fractions if you put together a 1 to 100 and a 100 to 200? Does there have to be a gap between the maximum of the first range and the minimum? I believe to be discrete fractions there must be some gap. Because due to the nature of this, of milling and sieving material, if you're abutting, they're probably going to overlap. In the hypothetical, where there was a perfect cutoff, then I think you could still have two fractions. But I think in what we're dealing with, which is grinding and sieving materials, there would probably be overlap. But I don't know how close you can get to perfectly abutting. That's, in fact, part of your answer to the graph on A935, right? I mean, theoretically, this could have been two different sources of filler material, and they end up reflecting an overlap in the overall ranges of those two materials. Theoretically, but recall Judge Hughes' ruling on the evidence in this case, right? And the undisputed evidence in this case was there weren't two things that were mixed. You know, we have declarations from manufacturers that we only provide this. We have the underlying data from manufacturers that say above this size particle, there is 0%. So on the facts of this case... Can you just explain, I mean, how this sort of, I don't know, 1% by volume... Again, I'm still on A935. The 1% by volume of everything from about 10 micrometers to about, I don't know, 25 or something, if there are actually no particles, even by mass, which is how the 669 data is presented, how do you get all this volume on this? Is this a mathematical artifact or something? Where does this... This is not like a trivial bump off to the left at 0.2 and 0.3. This is non-trivial. DeLuca tried to go back and take the product and then, in solution, try and separate out the particles. There's a certain amount of agglomeration that happened due to what he was doing. Particles either stuck together by remaining solvent or by polymer, and so this is an artifact of the process done by Dr. DeLuca. And the reason it isn't enough to overcome summary judgment is because we have the data to show no particles went in at that size. So it's the error in his test that shows that curve. I'm sorry, Chief. Going back to polypropylene... Yes. Why are you putting it into your products if not for affecting the viscosity? The polypropylene is the base polymer in this product. The polybutene is added to make the polypropylene slightly more sticky. So it's not the way they've said it that we're adding polypropylene to change the viscosity of the polybutene. We're using the polybutene to make a single polymer mix that is slightly more sticky than when you start with just polypropylene. And the point I would say on that issue, if I may have to... Do you have a final thought for us, Mr. Kevin? Yeah, my final thought on polypropylene as a filler is that there is no record evidence to dispute that in this case, in these accused products, it is not used as a filler. DeLuca's only point was the spec says it's an example of a filler, but he ignored that the spec also says it's in the family of what can be a polymer. Dr. Reitman put in multiple tests to show that this was a single, homogenous, miscible one polymer at the end. I think your final thought has many fractions in it. I apologize, Chief Judge Rader. Thank you. Mr. Castanis, you have your rebuttal time. Thank you, Chief Judge Rader. Four points. One, on the construction of the fractions term. The non-overlapping requirement that my friend has put forth in front of you is newly minted for purposes of this appeal. We've pointed that out at page three of the gray brief. If you compare the argument that's being made now to the argument they made in the district court, at page 8409, their construction in the district court was focused on unique median particle size and unique particle size distribution. There was nothing about non-overlapping curves. The district court judge did say discrete range or something like that. But I'm not sure what discrete means in that order, honestly. Does it mean completely non-overlapping or does it mean that they're not exactly the same? I don't know the answer to that. And the order, unfortunately, does not give us any detail as to what he meant by discrete there. But even if that's what he meant by discrete, it's wrong for the reasons that we've discussed earlier. And in fact, Judge Chen, you were exactly right in your questioning to my friend that you can get the A935 graph from taking two different sieved samples and mixing them together. In my friend's view, even a trimodal curve with deep, deep divots between the peaks would be a single fraction as long as they didn't descend entirely to zero. But how could we be convinced that there's three fractions there? I mean, every fraction has to have a beginning and an end, right? And alpha and an omega. Every fraction does, yes. In fact, I think one of the ways to understand, to make that really easy in this case, is to understand that the limitation to a single material was erroneous. Because I think the mind run of cases that were anticipated by the patentees in this case were when you would add a multiplicity of materials. Maybe they would be the same in some large chunks and small chunks, which you could distinguish because of what you're adding in. But more likely it's going to be that there's going to be some polymer and then there's going to be some inorganic material as well that's being added in. Judge Toronto, our discussion about graphs, if you look at the graph on page 8671, which is the mass frequency versus diameter graph of the material that you and my friend were talking about earlier, and compare that to the graph of A935, you will see that, and these are by the way reversed because the particle diameter is larger to the left on this one and to the right on the 935 one, you'll see that even in that one, using the mass frequency percent, you do have distinct curves that go back down to zero on the left side of that, which correspond roughly to the curves that are found on the right side of this volume distribution curve on A935. Can I ask you a question? There were some invalidity counterclaims or something in this case? I think if there are invalidity counterclaims, those have to be resolved on a remand. That's not going to get resolved by this appeal. Did they get, as a technical but jurisdictional matter, dismissed without prejudice? I think that's a question better put to my opponent than to me. I don't recall off the top of my head whether they were dismissed. If we agreed with you on the filler point and agreed not only that the filler can have more than one material, but that there was a factual question about whether polypropylene could be included in the filler. Not because it was different, but because it didn't somehow become part of a homogenous thing. Do we need to reach questions about fractions? I think that it would be wise for this court to correct the district court's misunderstanding that there is a high or not small limitation on there. But I don't think also that you have to see the order of mixing argument as being anything that would impede an appellate finding of infringement there. Because, honestly, the only argument that's been put forth against infringement with regard to that argument is that what they do is they add a liquid polymer to make the filler more sticky instead of adding filler to make a liquid adhesive less flowable. And I think that is a semantic argument. It doesn't change the unvarnished facts of what they add and what adding the polymers together accomplishes, which is exactly that of a filler. Can you give us a final thought with very little filler? Thank you. Thank you. That'll do. All rise.